## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

WALGREEN CO., THE KROGER CO.,
ALBERTSONS COMPANIES, INC. and H-E-B,
L.P.,

      Plaintiffs,

vs.

TAKEDA PHARMACEUTICAL COMPANY
LIMITED and TAKEDA
PHARMACEUTICALS U.S.A., INC.,

      Defendants.

CASE NO.

JURY TRIAL DEMANDED

## COMPLAINT AND DEMAND FOR JURY TRIAL

      Plaintiffs Walgreen Co., The Kroger Co., Albertsons Companies, Inc. and H-E-B,

L.P. ("Plaintiffs") sue Defendants Takeda Pharmaceutical Company Limited and Takeda

Pharmaceuticals U.S.A., Inc. (collectively "Takeda") for Defendants' violations of the antitrust

laws relating to the pharmaceutical drug Amitiza.  For their Complaint, Plaintiffs allege as

follows:

### I.      INTRODUCTION

      1.      This is a civil antitrust action seeking treble damages and other relief arising out

of the Defendants' unlawful exclusion of generic substitutes for the branded drug Amitiza, which

is used to treat chronic idiopathic constipation, irritable bowel syndrome and other gastro-

intestinal ailments.  The active ingredient in Amitiza is lubiprostone.  In September 2014,

Takeda, its marketing partner Sucampo Pharmaceuticals, Inc. ("Sucampo"), and a putative

generic competitor, Par Pharmaceutical, Inc. ("Par"), entered into an anticompetitive settlement

agreement that (1) delayed Par's entry until January 1, 2021; (2) ensured that there would be

only one generic on the market beginning January 1, 2021 (either Par's product alone or an authorized generic manufactured by Takeda/Sucampo and distributed by Par), with Takeda/Sucampo and Par agreeing to split the gross profit equally; and (3) included incentives designed to maintain the one-generic-only state of competition for as long as possible after January 1, 2021. Takeda subsequently entered into a similar arrangement with Dr. Reddy's Laboratories, Inc.

2.      Takeda and its co-conspirators concealed the anticompetitive aspects of their agreement for years. They concealed it from the federal court presiding over the Hatch-Waxman patent litigation that the litigating parties settled in September 2014 and affirmatively misled the court by stating that the agreement was "procompetitive." They also concealed the anticompetitive aspects of the agreement from the financial community by selectively redacting the copy of the settlement agreement included in Takeda's SEC filings.

3.      In the absence of Defendants' unlawful conduct, generic versions of Amitiza would have been on the market years earlier than January 2021, and additional generic versions of the drug would have become available thereafter.

4.      When the Food and Drug Administration concludes that a generic is therapeutically equivalent to a brand, it assigns an AB-rating to the generic. The only material difference between AB-rated generic and brand name drugs is their price. Generics are at least 20% cheaper than their branded counterparts when only one generic is on the market and at least 50% cheaper when there are multiple generic competitors on the market. As a result, generics constitute both (a) an opportunity for drug purchasers to obtain enormous cost savings and (b) a serious threat to the monopoly power and profits of the manufacturer of the corresponding brand name drug. Due to their lower price, AB-rated generics typically take 90% or more of the sales of a drug molecule from the brand name product within six months of generic entry. These

2

extremely rapid erosion rates of the brand manufacturer's sales are encouraged by state drug substitution laws, which permit (and in some cases require) dispensing pharmacies like the ones owned and operated by Plaintiffs to substitute available AB-rated generic drugs for a brand drug unless the prescribing physician specifically orders otherwise (by indicating that the drug should be "dispensed as written" or its equivalent).

5.     Defendants' conduct was designed to, did, and continues to: (a) delay the entry of less expensive, AB-rated generic versions of Amitiza; (b) fix, raise, maintain or stabilize the price of lubiprostone; (c) allocate 100% of the United States market for lubiprostone to Takeda from September 2014 to January 2021; and (d) allocate to Takeda and Par collectively 100% of the United States market for lubiprostone beginning in January 2021.

6.     Takeda's monopoly power in the lubiprostone market was maintained through willful exclusionary conduct, as distinguished from a superior product, business acumen, or historical accident.

7.     As alleged in greater detail below, Defendants' scheme to delay generic competition violated sections 1 and 2 of the Sherman Act, injuring Plaintiffs (and their assignors) and causing Plaintiffs (and their assignors) to pay overcharges on their purchases of branded and generic Amitiza.

## II.     PARTIES

8.     Plaintiff Walgreen Co. ("Walgreen") is an Illinois corporation having its principal place of business at 200 Wilmot Road, Deerfield, Illinois 60015. Walgreen owns and operates retail stores in several states at which it dispenses prescription drugs, including Amitiza, to the public.  Walgreen brings this action in its own behalf and as the assignee of AmerisourceBergen Drug Corporation, a pharmaceutical wholesaler, which during the relevant period purchased

Amitiza and generic Amitiza directly from Takeda and its co-conspirators for resale to Walgreen and which has expressly assigned its claims arising out of those purchases to Walgreen.

9.      Plaintiff The Kroger Co. ("Kroger") is an Ohio corporation having its principal place of business at 1014 Vine Street, Cincinnati, Ohio 45202.  Kroger owns and operates retail stores in several states at which it dispenses prescription drugs, including Amitiza, to the public. Kroger brings this Action in its own behalf and as the assignee of Cardinal Health, Inc., a pharmaceutical wholesaler, which during the relevant period purchased Amitiza and generic Amitiza directly from Takeda and its co-conspirators for resale to Kroger and which has expressly assigned its claims arising out of those purchases to Kroger.

10.      Plaintiff Albertsons Companies, Inc. ("Albertsons") is a Delaware corporation having its principal place of business at 250 Parkcenter Boulevard, Boise Idaho 83706. Albertsons' affiliates own and operate retail stores in several states at which they dispense prescription drugs, including Amitiza, to the public.  Albertsons brings this Action in its own behalf and as the assignee of McKesson Corporation ("McKesson"), a pharmaceutical wholesaler, which during the relevant period purchased Amitiza and generic Amitiza directly from Takeda and its co-conspirators for resale to Albertsons' affiliates and which has expressly assigned its claim arising out of those purchases to Albertsons.

11.      Plaintiff H-E-B, L.P. ("HEB") is a Texas limited partnership having its principal place of business at 646 South Main Avenue, San Antonio, Texas 78204.  HEB owns and operates retail stores at which it dispenses prescription drugs, including Amitiza, to the public. HEB brings this Action in its own behalf and as the assignee of McKesson, which during the relevant period purchased Amitiza and generic Amitiza directly from Takeda and its co-conspirators for resale to HEB and which has expressly assigned its claims arising out of those purchases to HEB.

4

12.     Defendant Takeda Pharmaceutical Company Limited ("Takeda Japan") is a Japanese corporation having a principal place of business at 1-1, Nihonbashi-Honcho 2-chome, Chuo-ku, Tokyo, Japan. Takeda Japan owns and controls Takeda Pharmaceuticals U.S.A., Inc., and was a party to the unlawful settlement agreement with Par.

13.     Defendant Takeda Pharmaceuticals U.S.A., Inc. ("Takeda U.S.A.") is a corporation jointly owned by Takeda Japan and another Takeda Japan subsidiary, third party Takeda Pharmaceuticals International, AG.  Takeda's principal place of business is at 95 Hayden Avenue, Lexington, Massachusetts 02421. As Takeda's website states: "Massachusetts serves as the U.S. hub for several global business operations, including the U.S. Commercial Business Unit, Global R&D, Global Oncology, Global Vaccines, Biologics Manufacturing and Cell Therapy Manufacturing." Takeda U.S.A. was a party to the unlawful settlement agreement with Par and sold branded Amitiza in the United States and its territories during the class period.

14.     Third party co-conspirator Par Pharmaceutical, Inc. ("Par") is a New York corporation with its principal place of business in Chestnut Ridge, New York.  Par is in bankruptcy.

15.     Third party co-conspirator Sucampo Pharmaceuticals ("Sucampo") is a Delaware corporation based in Bethesda, Maryland that co-developed and commercialized Amitiza with its partner Takeda. Sucampo was a party to the anticompetitive agreements alleged herein.  It was subsequently acquired by Mallinckrodt plc.

16.     Third party Mallinckrodt plc ("Mallinckrodt") is an Irish public limited company that acquired Sucampo in February 2018 and took over its interests in Amitiza, including Sucampo's role in performing under the anticompetitive agreements alleged herein. Mallinckrodt is in bankruptcy.

17.     All of Defendants' actions described in this complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by the Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of Defendants.

### III.     JURISDICTION AND VENUE

18.     This action arises under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) & 26, and seeks to recover treble damages, permanent injunctive relief, costs of suit and reasonable attorneys' fees for the injuries sustained by Plaintiffs resulting from Defendants' antitrust violations in the United States market for Amitiza and its generic equivalents.  The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

19.     Venue is proper in this District pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b), (c), and (d) because during the relevant period, Defendants resided, transacted business, were found, or had agents in the United States and in this District, and a substantial portion of the alleged conduct that affected interstate trade and commerce discussed herein has been carried out in the United States and in this District.

20.     This Court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of its illegal scheme and conspiracy in the United States and in this District. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## IV.    REGULATORY BACKGROUND

### A.    Characteristics of the Prescription Pharmaceutical Marketplace

21.     The marketplace for the sale of prescription pharmaceutical products in the United States suffers from a significant imperfection that brand manufacturers can exploit in order to obtain or maintain market power in the sale of a particular pharmaceutical composition. Markets function best when the person responsible for paying for a product is also the person who chooses which product to purchase.  When the same person is responsible for both the payment and the choice of products, the price of the product plays an appropriate role in the person's choice of products and, consequently, the manufacturers have an appropriate incentive to lower the prices of their products.

22.     The pharmaceutical marketplace, however, is characterized by a "disconnect" between the payment obligation and the product selection.  State laws prohibit pharmacists from dispensing many pharmaceutical products, including Amitiza, to patients without a prescription written by a doctor.  The prohibition on dispensing certain products without a prescription introduces a disconnect between the payment obligation and the product selection.  The patient (and in most cases his or her insurer) is obligated to pay for the pharmaceutical product, but the patient's doctor chooses which product the patient will buy.

23.     Brand manufacturers exploit this price disconnect by employing large forces of sales representatives to visit doctors' offices and persuade them to prescribe the manufacturer's products.  These sales representatives do not advise doctors of the cost of the branded products. Moreover, studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are insensitive to price differences because they do not have to pay for the products.

24.     The relative unimportance of price in the selection of a prescription drug reduces what economists call the price elasticity of demand—the extent to which unit sales go down when price goes up.  This reduced price elasticity in turn gives brand manufacturers the ability to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable.  The ability to profitably raise price substantially above marginal cost is what economists and antitrust courts refer to as market power.  The result of the market imperfections and marketing practices described above is to allow brand manufacturers to gain and maintain market power with respect to many branded prescription pharmaceuticals.

**B.      The Regulatory Structure for Approval of Generic Drugs and the Substitution of Generic Drugs for Brand Name Drugs**

25.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain FDA approval to sell the product by filing a New Drug Application ("NDA").  21 U.S.C. §§ 301-392.  An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.  21 U.S.C. § 355(a), (b).

26.     When the FDA approves a brand manufacturer's NDA, the drug product is listed in an FDA publication titled Approved Drug Products with Therapeutic Equivalence Evaluations, commonly known as the "Orange Book."  The manufacturer must list in the Orange Book any patents that the manufacturer believes could reasonably be asserted against a generic manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the listed patents.  If any such patents issue after the FDA approves the NDA, the manufacturer must subsequently list them in the Orange Book within thirty days of their issuance.  21 U.S.C. § 355(b)(1) & (c)(2).

27.     The FDA relies completely on the brand manufacturer's representations about patent validity and applicability, as it does not have the resources or authority to verify the

validity or applicability of the manufacturer's patents.  In listing patents in the Orange Book, the FDA merely performs a ministerial act.

### C.   The Hatch-Waxman Amendments

28.   The Hatch-Waxman Amendments (also simply "Hatch-Waxman"), enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly New Drug Applications ("NDAs").  *See* Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585, as amended (1984).  A manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA").  An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA.  It must only show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug and is absorbed at the same rate and to the same extent as the brand drug.  In other words, the ANDA must demonstrate that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug.  The FDA assigns oral-dosage-form generic drugs that are therapeutically equivalent to their brand-name counterpart an "AB" rating.

29.   Bioequivalence exists when the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart.  21 U.S.C. § 355(j)(8)(B).

30.   Congress enacted the Hatch-Waxman Amendments to expedite the entry of legitimate (non-infringing) generic drugs, thereby reducing healthcare expenses nationwide.  Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

31.     The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches, and ushering in an era of historically high profit margins for brand manufacturers.  In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did.  In 1984, prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009, total prescription drug revenue had increased many-fold to $300 billion.

**D.     Paragraph IV Certifications**

32.     To obtain FDA approval of an ANDA, a manufacturer must certify that the generic drug will not infringe any patents listed in the Orange Book.  Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications:

i.      that no patent for the brand drug has been filed with the FDA (a "Paragraph I certification");

ii.     that the patent for the brand drug has expired (a "Paragraph II certification");

iii.    that the patent for the brand drug will expire on a particular date and the manufacturer does not seek to market its generic product before that date (a "Paragraph III certification"); or

iv.     that the patent for the brand drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

33.     If a generic manufacturer files a Paragraph IV certification, a brand manufacturer can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement.  If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the Paragraph IV certification ("Paragraph IV Litigation"), the FDA will not grant final approval to the ANDA until the earlier of: (a) the passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or not

infringed by the generic manufacturer's ANDA. Until one of those conditions occurs, the FDA may grant "tentative approval," but cannot authorize the generic manufacturer to market its product. The FDA may grant an ANDA tentative approval when it determines that the ANDA would otherwise be ready for final approval but for the 30-month stay.

34.     As an incentive to spur manufacturers to seek approval of generic alternatives to branded drugs, the first generic manufacturer to file an ANDA containing a Paragraph IV certification typically gets a period of protection from competition from other generic versions of the drug. For Paragraph IV certifications made after December 2003, the first generic applicant receives 180 days of market exclusivity. This means that the first approved generic is the only available generic for at least six months, which effectively creates a duopoly between the brand company and the first-filing generic during this period. This 180-day exclusivity period is extremely valuable to generic companies. When only one generic is on the market, the generic price, while lower than the branded price, is much higher than after multiple generic sellers enter the market. Generics are usually at least 25% less expensive than their brand name counterparts when there is a single generic competitor, but this discount typically increases to 50% to 80% (or more) when there are multiple generics on the market. Being able to sell at the higher duopoly price for six months may be worth hundreds of millions of dollars.

35.     The first generic applicant can help the brand manufacturer "game the system" by delaying not only its own market entry, but also the market entry of all other generic manufacturers. The first generic applicant, by agreeing not to begin marketing its generic drug, thereby delays the start of the 180-day period of generic market exclusivity. This tactic creates a "bottleneck" because later generic applicants cannot launch until the first generic applicant's 180-day exclusivity has elapsed or is forfeited.

### E.    Benefits of Generic Drugs

36.     Generic versions of brand name drugs contain the same active ingredient, and are determined by the FDA to be just as safe and effective, as their brand name counterparts.  The only material difference between generic and brand name drugs is their price.  The launch of a generic drug thus usually brings huge cost savings for all drug purchasers.  The Federal Trade Commission ("FTC") estimates that, by one year after market entry, the generic version takes over 90% of the brand's unit sales and sells for 15% of the price of the brand name product.  In retail pharmacy chains, such as Plaintiffs, a generic typically achieves at least an 80% substitution rate within 90 days.  As a result, brand name companies such as Takeda view competition from AB-rated generic drugs as a grave threat to their bottom lines.

37.     Due to the price differentials between brand and generic drugs, and other institutional features of the pharmaceutical industry, including state generic substitution laws, pharmacists liberally and substantially substitute for the generic version when presented with a prescription for the brand-name counterpart.  Since passage of the Hatch-Waxman Amendments, every state has adopted substitution laws that either require or permit pharmacies to substitute generic equivalents for brand prescriptions unless the prescribing physician directs the pharmacy not to substitute by writing "dispense as written" or equivalent language on the prescription.

38.     There is an incentive to choose the less expensive generic equivalent in every link in the prescription drug chain.  Pharmaceutical wholesalers and retailers pay lower prices to acquire generic drugs than to acquire the corresponding brand-name drug.  Health insurers and patients also benefit from the lower prices of generic products.

39.     Until a generic version of the brand drug enters the market, there is no bioequivalent generic drug to substitute for, and to compete with, the branded drug, and therefore the brand manufacturer can continue to profitably charge very high prices (relative to cost)

without losing sales.  As a result, brand manufacturers, who are well aware of generics' rapid erosion of their brand sales, have a strong incentive to delay generic competition, including by using tactics such as the reverse-payment agreements at issue here.

> **F.     Brand and Generic Companies Have Strong Financial Incentives to Agree to Anticompetitive Terms**

40.     Because the Hatch-Waxman regulatory scheme automatically delays approval of an ANDA whenever a brand name manufacturer sues a potential generic competitor for alleged patent infringement, brand name manufacturers are incented to list invalid or unlikely-to-be-infringed patents in the Orange Book, and then bring patent lawsuits against any generic competitor that files an ANDA with a Paragraph IV certification. Brand name manufacturers often sue generics simply to delay generic competition, rather than to enforce valid patents against infringing products.

41.     To resolve patent litigation arising out of Paragraph IV Certifications, some brand name manufacturers have entered into "settlements" in which the brand name manufacturer pays off its generic competitors in exchange for a delay in generic competition. These exclusion payment agreements among horizontal competitors not to compete are commonly known as "pay-for-delay" or "reverse-payment agreements." The brand name manufacturer preserves increased profits by keeping its monopoly intact via a payment of some of the monopoly profits to the generic manufacturer, which in turn agrees to delay marketing its product.

42.     Initially, reverse-payment agreements took the form of a straight cash payment from the brand name manufacturer to the generic competitor. As a result of regulatory scrutiny, congressional investigations, and lawsuits, brand name and generic manufacturers have entered into increasingly elaborate agreements in an attempt to mask the fundamentally anticompetitive character of their agreements.  For example, the reverse-payment deals that were the subject of *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013), involved payments allegedly hidden in co-promotion

and manufacturing side-deals entered into in connection with  settlement of patent litigation over the brand drug AndroGel. Because the profits from delaying generic competition are so great, however, the incentive of drug manufacturers to  enter into such agreements remains.

43.     The 180-day marketing exclusivity to which first-filer generics may be entitled does not prevent a brand manufacturer from marketing its own generic alternative to the brand drug during the exclusivity period pursuant to its own approved NDA.  Such an "authorized generic" is identical to the brand drug, but is sold as a generic product either by the brand manufacturer itself or through an authorized third party.  Competition from an authorized generic during the 180-day exclusivity period substantially reduces the price of both the ANDA filer's generic drug and the authorized generic and, in addition, forces the first-filer to share the generic sales made at those lower prices with the brand-name manufacturer.  Both of these effects reduce the first-filer's revenues and profits.

44.     In its study, *Authorized Generic Drugs: Short-term Effects and Long-Term Impact* (August 2011), the Federal Trade Commission found that authorized generics capture a significant portion of sales, reducing the revenues generated by the first-filer's generic product by approximately 50% during the 180-day exclusivity period.  The first-filing generic makes significantly less money when it faces competition from an authorized generic because (1) the authorized generic takes a large share of unit sales from the first-filer; and (2) the presence of an additional generic in the market causes prices to decrease.

45.     Although first-filing generic manufacturers make significantly less money when faced with competition from an authorized generic during the 180 day exclusivity period, drug purchasers benefit from the lower prices caused by competition between the authorized generic and the first-filing generic.

14

46.     As a practical matter, authorized generics are the only means by which brand-name manufacturers engage in price competition with manufacturers of AB-rated generic drugs. Brand-name manufacturers generally do not reduce the price of their brand drugs in response to the entry of AB-rated generics.  Instead, they either raise the price to extract higher prices from the small number of "brand-loyal" patients or, more typically, they continue to raise the price of the brand drug at the same rate at which it increased prior to generic entry.

47.     Given the significant negative impact of an authorized generic on the first-filing generic's revenues, and the absence of any other form of price competition from the branded manufacturer, a brand manufacturer's agreement not to launch an authorized generic has tremendous economic value to the generic manufacturer.  Brand manufacturers have used such agreements as a way to pay the first-filer to delay entering the market.

## V.     OPERATIVE FACTS

### A.     Development of Amitiza

48.     In or around 1986, Japanese scientist Dr. Ryuji Ueno identified the therapeutic potential of prostones, a group of chemical compounds derived from prostaglandins, lipid-based compounds  that naturally occur in the human body. He then set out to patent his discovery. To secure that time-limited patent monopoly, he was required to make public the details of his invention.

49.     On January 28, 1987, Dr. Ueno filed a patent application in Japan that disclosed potential uses for  a novel type of prostaglandin E and its derivatives to treat or prevent ulcers.

50.     One year later, on January 28, 1988, Dr. Ueno filed a U.S. patent application directed to the same or similar inventions (no. 07/149,445). Dr. Ueno abandoned this initial U.S. application. On September 12, 1989, Dr. Ueno filed a continuation in part application (no. 07/406,830), but he abandoned that application as well. On May 13, 1991, Dr. Ueno filed

a continuation application (no. 07/700,895) that matured into U.S. patent no. 5,166,174, directed to specific forms/compounds of prostaglandin E.

51.     On August 6, 1992, Dr. Ueno filed a divisional application to his earlier '895 application. It too claimed specific forms/compounds of prostaglandin E as well as compositions of those compounds and their use as anti-ulcer treatments. It matured into U.S. patent no. 5,284,858 (discussed further below). As described further below, the '858 patent claims prostaglandin E(1), from which lubiprostone—the active pharmaceutical compound in Amitiza—is derived.

52.     In 1996, with patents in hand, Dr. Ueno and his then-wife and research partner Dr. Sachiko Kuno founded the pharmaceutical company Sucampo in Maryland to develop and commercialize prostone-based drugs for the United States market. Sucampo, along with its partner Takeda, went on to develop and sell the prostone-based constipation drug Amitiza (lubiprostone capsules).

**B.     Submission of the Amitiza NDA**

53.     On December 29, 1999, Sucampo submitted the original Investigational New Drug Application (no. 59623) for lubiprostone to the FDA. On April 11, 2001, following the conclusion of Phase II studies, Sucampo met with FDA to discuss plans for Phase III development, including the appropriate primary end point.

54.     Between September of 2001 and September of 2003, Sucampo conducted two adequate and well-controlled Phase III efficacy studies, SC0131 and SC0232. These two 4-week, randomized, placebo-controlled trials in patients with chronic idiopathic constipation showed that lubiprostone twice daily was statistically superior to a placebo as measured by spontaneous bowel movement frequency rate during week 1. Sucampo also conducted other

studies focused on safety, including a number of open label (*i.e.*, not placebo-controlled) studies.

55.     By the fall of 2004, Sucampo had obtained and licensed rights to patents related to lubiprostone (SPI-0211 or RU-0211) and was on its way to submitting an NDA. But it was a small company and needed help from a more experienced company with deeper pockets, marketing know-how, and manufacturing capabilities.

56.     Takeda—a multinational healthcare company with research, development and marketing activities in the U.S.—wanted to obtain potential drug products to develop and commercialize for gastroenterology indications.

57.     On October 29, 2004, Takeda Japan and Sucampo entered into a collaboration agreement under which the two companies agreed to cooperate to develop and commercialize lubiprostone. The scope of their cooperation included working towards regulatory approval for a commercial lubiprostone product, including preparing and submitting an NDA. Sucampo gave Takeda a 16-year license to co-develop, use, sell, promote, offer for sale, import, and distribute the product in the U.S. and Canada. Under the agreement, Sucampo was primarily responsible for clinical development, while Takeda was responsible for commercialization, marketing, and sales of the drug.

58.     Under the collaboration agreement, Sucampo and Takeda created a joint steering committee to manage their lubiprostone efforts. The committee was comprised of three executives from Sucampo and three executives from Takeda or its affiliates. Decisions of the joint steering committee had to be unanimous. It met at least twice a year and kept minutes. The joint steering committee would discuss any changes in market conditions or economic conditions that could affect lubiprostone. If unresolvable disputes arose, the CEO of Sucampo and the CEO of Takeda were required to meet to discuss and resolve the matter.

59.     Sucampo and Takeda also established a separate joint development committee to focus on clinical development of lubiprostone, including getting regulatory approvals. It was comprised of two management representatives, one appointed by Sucampo and one by Takeda. It met at least quarterly and kept minutes. It, too, operated by unanimous consensus. While this committee operated jointly, the agreement provided elsewhere that all drug approval applications would be filed in Sucampo's name.

60.     Sucampo and Takeda further established a joint commercialization committee and a joint manufacturing committee.

61.     The agreement contemplated that Takeda and Sucampo would seek additional indications for lubiprostone, and provided that Takeda would pay up to $50 million per each additional indication in accordance with the development plan developed and approved by the joint development committee. Takeda was to conduct and fund any required Phase IV studies.

62.     Under the agreement, Takeda paid a negotiated price for the Amitiza product, then sold it and paid a royalty back to Sucampo on the sale. For the sixteen-year term of the collaboration agreement, the royalty rate paid by Takeda was structured into six tiers based on annual net sales of Amitiza, ranging from 18–26%, resetting each year. As a result, Takeda was entitled to the vast majority of Amitiza's revenue throughout the relevant time period.

63.     In October of 2014, after entering into the unlawful agreement with Par, Takeda and Sucampo amended the North America agreement, extending the term of that agreement beyond December 2020. From 2014 through 2020, Takeda made all sales of Amitiza in the United States and retained about 75% of the net dollar sales of the drug after paying royalties to Sucampo. Thereafter, during the extended term of the agreement that began in January 2021, Takeda and Sucampo agreed to share the annual net sales of the drug.

64.     The agreement provided Takeda with an exclusive license to the Amitiza patents.

65.     Takeda represented and warranted that it would use its best efforts to maximize Amitiza sales revenue in the U.S. and Canada.

66.     From the spring of 2004, Takeda was integral to all Amitiza-related business and legal decisions under the collaboration agreement.

67.     Takeda and Sucampo also entered into a separate agreement addressing shared intellectual property. That agreement provided that Takeda and Sucampo shared a goal of maximizing the patent protection for lubiprostone and its approved indications. Sucampo agreed to consult Takeda about the prosecution of licensed patents and patent strategy for lubiprostone's approved and potential future indications. Sucampo further agreed to consult Takeda before it filed any patent infringement lawsuits, and Takeda had the right to make requests and recommendations concerning the prosecution of any such lawsuits. Sucampo agreed to inform Takeda of any infringement claim or threatened infringement claim (and vice versa). Takeda had the right to join any filed patent infringement litigation or to commence patent infringement litigation against generic competitors if Sucampo failed to do so. In any filed patent infringement suits, Takeda and Sucampo agreed to cooperate.

68.     On March 31, 2005, Takeda and Sucampo submitted NDA No. 21-908 to the FDA, seeking approval to manufacture, market and sell lubiprostone capsules (later branded Amitiza).  As previously agreed, Sucampo was identified as the sole applicant.

69.     As is typical, Sucampo and FDA exchanged communications about the application, with Sucampo and Takeda discussing those communications at every step. Sucampo made many additional supplemental submissions over the next ten months.

70.     On January 31, 2006, FDA approved Amitiza (lubiprostone capsules, 24 mcg) for the treatment of chronic idiopathic constipation in adults.

71.     Sucampo (with Takeda's blessing) initially submitted patent information asking the FDA to list the '858, '032, '016, and '174, patents in the Orange Book.  At the time, the patents had expiration dates between February 8, 2011 (pre-extension) and August 30, 2022.

72.     In April 2006, Takeda began selling Amitiza in the U.S. Takeda was responsible for the marketing, sales, and other commercialization efforts for Amitiza from that time forward.  From then on, Takeda and Sucampo jointly (and unanimously) determined how to maximize Amitiza sales and pursue approval of additional indications.

## C.     Patents Relating to Amitiza

73.     Over time, seventeen patents ostensibly claiming aspects of Amitiza and its uses were filed for and/or obtained through assignment and listed in the FDA's Orange Book.

74.     U.S. Patent No. 5,284,858 (the "'858 patent") covers prostaglandin E(1), from which lubiprostone—the active pharmaceutical compound in Amitiza—is derived. The '858 patent claimed the Amitiza drug substance, or compound, and was the strongest patent in the Amitiza arsenal. It expired on July 14, 2014 (with a regulatory extension).

75.     The remaining sixteen patents listed in the Orange Book had expiration dates ranging from 2020 to 2027 and fall into three categories.

76.     Seven patents claim methods of treating various diseases by administering certain drug products. These patents are U.S. Patent Nos.:

> 7,064,148 (the "'148 patent");
> 8,748,481 (the "'481 patent");
> 6,982,283 (the "'283 patent");
> 7,795,312 (the "'312 patent");
> 6,414,016 (the "'016 patent");
> 8,071,613 (the "'613 patent"); and
> 8,097,653 (the "'653 patent").

20

77.     The FDA only approved Amitiza to treat three indications. The methods of use claimed in these patents were far broader. In addition, an ANDA applicant need not seek approval for all of the indications/methods of use for which the brand drug has been approved. Under applicable FDA regulations, generic applicants are permitted to submit a "section viii statement" (named after a subsection in the relevant statute) and omit from the proposed labeling a method of use protected by a listed patent.

78.     Four patents claim drug product compositions. These patents are U.S. Patent Nos.:

  8,088,934 (the "'934 patent");
  6,583,174 (the "'174 patent");
  7,417,067 (the "'067 patent"); and
  8,097,649 (the "'649 patent").

79.     Five patents claim simple pharmaceutical formulations of prostaglandins. These patents are U.S. Patent Nos.:

  8,114,890 (the "'890 patent");
  8,779,187 (the "'187 patent");
  8,389,542 (the "'542 patent");
  8,026,393 (the "'393 patent"); and
  8,338,639 (the "'639 patent").

80.     To avoid infringing composition and formulation patents, generics can modify the brand's formula in ways that avoid the brand's patents but still produce a generic that is equivalent to the brand under the FDA's regulations. And, later-issued composition and formulation patents must stand on their own as non-obvious in light of, and as not anticipated by, the disclosures in earlier patents, applications, or other publications.

81.     As detailed below, none of these additional patents was a legitimate impediment to generic competition. However, because they were all listed in the Orange Book, every potential generic competitor had to address them.

82.     Neither Takeda nor Sucampo ever asserted the '174, '067, '649, '890, '934, or '148 patents against a would-be generic competitor. They gave a covenant not to sue on these

patents to at least one generic company. These patents did not prevent a generic company from introducing generic Amitiza.

83.     Takeda and Sucampo only asserted seven of the listed patents against Par.

**D**.     **An Additional Indication for IBS**

84.      On June 29, 2007, Sucampo submitted a supplemental new drug application ("sNDA") for 8 mcg Amitiza capsules for the treatment of Irritable Bowel Syndrome with constipation in adult women.

85.     On April 29, 2008, the FDA approved the application. Per the terms of their commercialization agreement, Sucampo and Takeda worked jointly to obtain and then maximize revenue from this new indication.

**E.     Bioequivalence Issues**

86.      In February 2010, Anchen submitted ANDA 201442 to the FDA seeking approval to manufacture, market, and sell a generic version of Amitiza in 8 and 24 mcg strengths once the '858 drug substance patent expired on July 14, 2014.

87.      On June 11, 2010, the FDA issued final guidance describing a new process to inform the public about product-specific bioequivalence studies to support ANDAs.  Under the new process, the FDA committed to announcing new or updated product-specific  guidance by publishing notice in the federal register and posting the draft or final bioequivalence recommendations on its website.  The process required the federal register notice to identify a comment period, open to the public and industry, and to specify instructions on how comments should be submitted. The FDA stated that "[t]he public is encouraged to submit comments" through the designated channel and that it would "consider received comments in developing final  BE [bioequivalence] recommendations."  FDA explained that it "adopted this process as

a means to develop and disseminate product-specific BE recommendations and provide an opportunity for the public to consider and comment on those recommendations."

88.     In August 2010, six months after Anchen submitted its ANDA, FDA took three actions with respect to lubiprostone generics. It issued a draft bioequivalence guidance, it published information about how to conduct dissolution testing for lubiprostone generics, and it refused to accept Anchen's initial ANDA until Anchen re-submitted bioequivalence studies that conformed with the guidance.

89.     Neither a draft nor a final guidance is required for the FDA to approve an ANDA. Guidance documents represent the FDA's current thinking on a particular topic. They do not bind the FDA or the public; sponsors can and do use alternative approaches to establish requirements for approval of an application such as bioequivalence if the approach satisfies the requirements of the applicable statutes and regulations. This option is appears at the top of every draft and final guidance document, accompanied by the suggestion that "[i]f you want to discuss an alternative approach, contact the Office of Generic Drugs."

90.     FDA only posts draft guidance documents and seeks comment after significant evaluation of the circumstances under which it would approve an ANDA for a particular product. Thus, the August 2010 issuance of the draft guidance for lubiprostone capsules was a clear signal to the drug industry that the FDA had studied the applicable science and actively considered, and would continue to consider, the circumstances under which it would accept for filing, and approve, ANDAs for generic Amitiza. FDA had done that work in connection with the bioequivalence information included in Anchen's ANDA.

91.     The 2010 Draft Guidance recommended two bioequivalence studies for ANDAs for orally administered lubiprostone capsules: (1) a comparative pharmacokinetic ("PK") study of the 24 mcg dose in healthy males and females; and (2) a comparative clinical

endpoint study of the 24 mcg dose conducted in adults with chronic idiopathic constipation. These recommendations applied to all generic formulations, regardless of how similar they were to the Amitiza formulation (*e.g.*, regardless of whether they had qualitatively and quantitatively the same inactive ingredients as Amitiza).

92.     The guidance also recommended conducting dissolution testing on 12 dosage units, and referred to further product-specific dissolution testing information to be provided in the FDA's online Dissolution Methods Database.

93.     The Federal Register notice explained that "FDA believes that making this information available on the Internet will . . . provide a meaningful opportunity for the public to consider and comment on product-specific BE study recommendations." It also provided instructions for submitting comments "at any time," either electronically via http://www.regulations.gov or in writing by mailing them to a specified address for the Division of Dockets Management.

94.     Also in August 2010, the FDA updated its Dissolution Methods Database to include details about suggested dissolution methods for lubiprostone (as referenced in the draft guidance). Sometimes, a sponsor and the FDA exchange communications about whether the sponsor's methods of conducting the recommended dissolution testing are adequate. Here, the FDA identified how it wanted dissolution testing to be done up front. This notification again reflects that FDA had considered appropriate bioequivalence methods for lubiprostone in detail.

95.     As noted, in August 2010, FDA refused to accept Achen's ANDA.  It did so in a refuse to receive ("RTR") notification indicating that Anchen should amend its ANDA to include additional clinical study data of the kind described in the draft guidance (or use an FDA-accepted alternative approach that satisfied the applicable statutes and regulations).

### F.        Completion of Clinical Studies

96.        Faced with FDA's suggestion that it conduct additional studies, Anchen (and later Par) moved to comply with that suggestion.  Anchen/Par conducted the studies and encountered no unexpected  challenges that prevented it either from completing the studies or from establishing that its  proposed formulation was bioequivalent to Amitiza.

97.        In January 2011, Anchen hired Novum Pharmaceutical Research to conduct the studies at a total cost of $6.4 million.

98.        In May 2011, Anchen began recruiting for a phase III, three-arm (Amitiza, generic,  placebo), double-blind, randomized clinical study using the 24 mcg dose (as described in the  draft guidance).  Ultimately, 808 subjects enrolled. The primary end point was establishing the clinical equivalence of Amitiza and Anchen's lubiprostone formulation treatments and the  superiority of each active treatment to a placebo during the 7-day randomization period of the study (as recommended in the  draft guidance).

99.        In November 2011, Par acquired Anchen, including all rights to its lubiprostone  ANDA.  Par continued the ongoing bioequivalence studies.

100.        The clinical study concluded in June 2012. Shortly thereafter, Par submitted the  results of the studies recommended by the guidance to FDA, and the FDA accepted Par's lubiprostone ANDA for filing.

101.        As the first generic to submit a substantially complete ANDA for lubiprostone, Par was potentially eligible for 180 days of ANDA exclusivity for generic Amitiza when it received approval from the FDA.  As noted above, the 180-day exclusivity created by Hatch-Waxman prevents the FDA from approving any other ANDA during that time but does not prevent the brand company from launching an authorized generic or AG.

### F.   A Third Indication

102.    On or around July 26, 2012, Sucampo and Takeda announced the filing of an sNDA with FDA seeking approval for a new indication for Amitiza for the treatment of opioid-induced constipation in patients with chronic pain not due to cancer.

103.    Opioid-induced constipation is one of the most common side effects of opioid-based medicines, which are used in the management of chronic pain. OIC affects the majority of patients treated chronically with opioids. Some patients discontinue opioid therapy and thereby endure pain rather than suffer such constipation.

104.    According to Charlie Baum, Vice President for U.S. Medical Affairs at Takeda: "This submission [was] an important milestone for both companies."

### G.   Paragraph IV Notices and Litigation

105.    On December 26, 2012, Par sent a paragraph IV notice letter to Sucampo, stating that it had filed an ANDA seeking approval to manufacture, market, and sell a generic version of Amitiza following expiration of the '858 drug substance patent in 2014.  Par's notice letter claimed that the other twelve patents then listed in the Orange Book as covering Amitiza were invalid, unenforceable, or would not be infringed by Par's generic product. Sucampo represented that it received the letter on January 2, 2013.

106.    On January 24, 2013, Par sent a second paragraph IV notice letter, certifying that the newly issued '639 patent was invalid, unenforceable, and/or not infringed by Par's generic Amitiza product.

107.    On February 7, 2013, Takeda and Sucampo sued Par in the United States District Court for the District of Delaware alleging infringement of six patents: the '016, '613,

'312, '393, '653, and '639 patents.[1] Because it filed within 45 days of receiving Par's initial paragraph IV notice, the filing of this action triggered a 30-month stay of FDA's approval of Par's ANDA, meaning that the FDA could not approve Par's ANDA until on or around July 2, 2015.

108.    In April 2013, the FDA approved Amitiza for treatment of OIC in adult patients with chronic, non-cancer pain, which was later qualified to add the language "including patients with chronic pain related to prior cancer or its treatment who do not require frequent opioid dosage escalation."

109.    On May 7, 2013, Par sent a third Paragraph IV notice letter certifying that the newly issued '542 patent was invalid, unenforceable, and/or not infringed by Par's generic Amitiza product.

110.    On July 3, 2013, Takeda and Sucampo amended their complaint to allege infringement of the '542 patent.

111.    None of the asserted patents would have prevented generic entry by Par. Because Par obtained the '639 and '542 patents after it filed its ANDA, they did not trigger a 30-month stay nor otherwise present a barrier for Par to obtain FDA approval or enter the market. Par also obtained the '187 and '481 patents after it filed its ANDA, and therefore those patents did not trigger a 30-month stay nor otherwise present a barrier for Par to obtain FDA approval or enter the market. Takeda and Sucampo never asserted any of the '542, '187, or '481 patents in litigation against Par.

112.    At no point in the litigation did Sucampo and Takeda accuse Par of infringing the '174, '067, '649, '890, '934, or '148 patents. These patents did not present a barrier to Par

---

[1] *Sucampo AG. v. Anchen Pharms., Inc.,* No. 13-202 (D. Del. Feb. 7, 2013).

obtaining FDA approval or entering the market. These unasserted patents were included in the covenant not to sue obtained by a later-filing generic manufacturer. That later-filing generic manufacturer alleged that Par had received the same covenant not to sue on these patents.

113.    The '283 patent did not present a barrier for Par to obtain FDA approval or enter the market either. That patent contained narrow claims directed only to methods of treating opioid-induced constipation that could have been addressed with a section viii carve-out. Takeda and Sucampo never asserted the '283 patent in litigation against Par.

114.    The litigation proceeded through discovery, with competing claim construction briefs filed on January 17, 2014.

## H.    A Baseless Citizen Petition

115.    On January 17, 2014, the same day that it submitted its claim construction brief, Sucampo (with Takeda's knowledge, input, and approval) submitted a citizen petition to the FDA asking the FDA not to approve generic versions of Amitiza unless the generic applicants conducted additional onerous and unnecessary bioequivalence tests. The petition requested that the FDA "revise its existing proposed criteria for how to demonstrate bioequivalence for lubiprostone capsules as set forth in this petition" and "apply such revised criteria to any abbreviated new drug application . . . that relies upon the new drug application . . . for AMITIZA® (lubiprostone) capsules (NDA 21-908) as the reference listed drug." The petition further stated that the FDA's existing guidance was not sufficient to ensure that generic Amitiza formulations have "the same safety profile" as Amitiza in all three approved indications.

116.    Takeda's and Sucampo's citizen petition was unlikely to succeed for at least the following reasons:

117.    First, the petition was premised on the notion that it is incumbent on ANDA applicants to conduct clinical studies to prove that their generic drugs are safe and effective. But such a requirement is contrary to the statutory structure imposed by Congress and the FDA's regulations and practices implementing that structure. As described above, ANDA applicants need not independently prove safety and efficacy so long as they establish bioequivalence. And the statute requires the FDA to approve an ANDA "unless" the information in an ANDA is insufficient to show bioequivalence. The FDA has repeatedly explained this requirement to drug companies, including in earlier citizen petition responses.

118.    Second, the petition did not include data or information showing that a generic approved in accordance with the recommendations in the 2010 draft guidance would produce different effects in the body than the brand, or that any such differences would have clinically meaningful consequences. It merely speculated:

- "A generic lubiprostone product *could* demonstrate pharmacokinetic bioequivalence of a single-dose of 48 mcg, while having up to a 25% higher plasma concentration than AMITIZA. This higher effective dose *could* result in more adverse events."

- "a lubiprostone product that is more potent than AMITIZA *could* achieve efficacy endpoints but lead to diarrhea, and eventually, dehydration."

The FDA had repeatedly rejected similar, speculative and unsupported arguments by brand manufacturers, including in past citizen petition denials. It had also mounted a public education campaign to dispel such unscientific myths about generics drugs.

119.    Third, in light of the statutory scheme and FDA's regulations and practices implementing that scheme, Sucampo's requests violated the FDA's stated goal of avoiding unnecessary experimentation on humans.

120.    Takeda and Sucampo could have submitted their comments on the draft guidance in the manner FDA requested and at the time that FDA requested feedback. Instead,

they chose a process known to delay generic approvals and strategically timed the filing of the petition to potentially push the approval of Par's ANDA out past the expiration of the 30-month stay.

121.    At the time, Takeda and Sucampo knew that Par had filed an ANDA for lubiprostone capsules and knew or had reason to know that Par had approached bioequivalence in the manner recommended by the FDA in the 2010 draft guidance. Information about Par's clinical trial, including its design and end points, was available through clinicaltrials.gov. Asking the FDA to impose additional requirements on ANDA applicants was asking the FDA to require that Par do even more work (and expensive, time-consuming, and scientifically unnecessary work at that) before approving Par's ANDA.

### I.    The Unlawful Agreement

122.     In September 2014, Takeda and its partner Sucampo, on the one hand, and Par, on the other, entered into the 2014 agreement, under which (1) Par agreed to delay launching a generic version of Takeda's Amitiza until January 1, 2021; (2) Par was granted rights to sell either its ANDA product or Takeda's authorized generic without any generic competition from the brand companies for at least six months and possibly an additional 18 months until January 1, 2023; and (3) the brand companies and Par agreed to split the gross profit from Par's sales during the exclusivity period 50/50 so long as Par was the only generic on the market and to reduce the brand's share if additional generics entered..

123.     The 2014 agreement is only in part reflected in a September 30, 2014 written settlement document that resolved the patent litigation. The written settlement document reflects some of the anticompetitive terms but fails to disclose others, and is written to obscure the true anticompetitive effect of the overall 2014 agreement. For years, Takeda, Sucampo and Par concealed the anticompetitive aspects of their agreement by, among other things,

disclosing a false and illusory reservation by Takeda/Sucampo of a right to launch an authorized generic product in competition with Par while failing to disclose the royalty structure in the agreement that made it economically irrational for them to introduce such an authorized generic, and by telling the district court overseeing the patent infringement litigation that their settlement agreement was "procompetitive."

124.     At its core, the 2014 agreement is an agreement among Takeda, Sucampo, and Par that Par would be the one *and only*, generic on the market for at least six months and up to two years, and that the brand companies and Par would split the monopoly profits resulting from having only a single generic on the market.  The monopoly profits guaranteed to Par when it was the only seller of generic Amitiza represented a payment to Par in return for its agreement not to introduce generic Amitiza until January 1, 2021.  Under the agreement, Par was granted the option to decide whether to launch its own ANDA product or an AG.  The economic structure of the agreement was identical whether the single generic was an ANDA product or an AG, and the overcharges suffered by Plaintiffs are the same regardless of whether the generic product was an ANDA product or an AG. In either event, there would only be a single generic on the market.

125.     As detailed below, the split of monopoly profits in the anticompetitive agreement resulted in a large reverse payment to Par which induced Par to delay its entry and caused Plaintiffs and other purchasers to pay overcharges. The written settlement document not only does not contain all of these terms but in fact works to obscure them to give the illusion of a procompetitive settlement.

126.     Under the 2014 agreement, Par agreed to delay selling a generic version of Amitiza until January 1, 2021.  Par agreed to pay a declining royalty on its gross profits from the sales of generic Amitiza once it launched based on the number of other generic entrants.

Specifically, Par would pay (1) 50% as the only generic on the market, (2) 15% if one other generic launched (whether an AG or a third-party ANDA generic), and (3) no royalty with two or more additional generics.

127.     The 2014 agreement gave Par the option to market an AG of Amitiza as of January 1, 2021 instead of manufacturing and selling its own generic Amitiza under its ANDA, and Par ultimately elected to do so.  Takeda and Sucampo agreed that if Par elected to market an AG, they would supply the AG to Par at a negotiated price.  Par would then pay Takeda a royalty calculated as described in the preceding paragraph.  In the absence of the unlawful agreement, Par would have continued to prosecute its own ANDA and would have received final approval from the FDA some time before January 1, 2021.

128.     While Takeda and Sucampo technically reserved the ability to launch their own authorized generic product in the written settlement document, the 2014 agreement ensured that there would only be a single generic (either ANDA or AG) because the structure of the agreement ensured that both Takeda/Sucampo and Par would be better off economically if Takeda never launched an AG to compete with Par.  Whether Par elected to sell its own generic Amitiza or an AG, the brand manufacturers would be better off if they did not launch a second AG because of the reduced royalty amount under the agreement resulting from the launch of a second AG.

129.     AB-rated generics are commodity products.  As a result, the more sellers of AB-rated generics there are on the market, the lower their prices. The greatest downward pressure on generic prices occurs when a second generic launches. Before then, the sole generic typically prices at a small discount to the brand. With additional entrants, the discount increases, reducing prices for purchasers and profits for manufacturers.

130.     Pursuant to the 2014 agreement, it was more profitable for both Takeda and Par for Par to be the only generic on the market—whether as the sole AG or through its own ANDA – than for Takeda to compete with Par by introducing another AG. Although Par's royalty rate would drop from 50% to 15% if another generic or AG were on the market, it was more profitable for Par to pay the higher royalty rate than to compete with Takeda's AG because, in the absence of such competition from Takeda, Par would realize much higher unit sales at much higher prices. Similarly, it was more profitable for Takeda not to launch an AG since Takeda would earn more by not launching an AG and receiving a 50% royalty on Par's sales at a higher price than it would by launching an AG that would compete with Par's ANDA product, drive prices down, and result in much lower overall revenues, including a lower royalty of 15% from Par.

131.     Takeda was also incentivized to delay all generics other than Par for as long as possible. If another generic launched, Takeda's royalty from Par would drop from 50% to 15%, and the generic price would also fall due to competition.

132.     Under normal circumstances, brand companies license third parties to market and sell authorized generics as a way of recouping some of the sales that the ANDA generic(s) take away from the brand company. Indeed, Takeda has done so on four prior occasions (Duetact, Kazano, Nesina and Oseni).

133.     The industry standard for AG licenses outside the context of pay-for-delay settlements is an agreement in which the generic company launching the AG receives 10% of the profits from the sale of the product and the brand company receives the other 90%. In contrast, the 2014 agreement allowed Par to keep half of the profits. This below-market rate royalty, in combination with the incentives given to Takeda not to compete against Par with an

AG, was effectively a large payment from the brand companies to Par to delay its entry and avoid the risk of immediate generic competition.

134.   According to IQVIA, Amitiza U.S. sales were about $427 million for the 12 months ending on Sept. 30, 2020.

135.   As part of the 2014 agreement, Takeda and Par agreed that there would be only one generic version of Amitiza on the market for at least 180 days.  Although this period of exclusivity ultimately continued for 2 years, a conservative value of the payment that Takeda transferred to Par under the agreement can be estimated by using reasonable and well-established metrics regarding generic substitution and generic price discounts to calculate the value of this limited competition for the first 180 days, as shown below.

136.   Absent the anticompetitive 2014 agreement, assuming that Par launched its ANDA product and the brand launched an AG, the two generics would be priced at approximately 60% of the brand and would together take 90% of all lubiprostone unit sales. In such a case, Par and the AG would split the generic sales.  Thus, based on Amitiza's annual sales of $427 million, each of Par and Takeda would earn $57.6 million from sales of generic Amitiza in the first 180 days (when other ANDA generics are foreclosed from the market by FDA regulation), calculated as follows:  ($427 million) * (0.5 year) * (0.6 of the brand price) * (0.9 generic penetration) * (0.5 of the generic market).

137.   Under the 2014 agreement, Par and Takeda made more by having only one generic version of Amitiza on the market than they would have made by competing with one another.

138.   The revenues and profits of Par and Takeda pursuant to the 2014 agreement from the launch of a single generic (Par's ANDA or Takeda's AG) may be estimated.  A single generic would be priced at about 90% of the brand, and would take 90% of all

lubiprostone unit sales, and 100% of all generic sales. Par's revenues during the first 180 days would be $173 million calculated as follows: ($427 million) * (0.5 year) * (0.9 of the brand price) * (0.9 generic penetration). Assuming a 90% gross profit margin with only one generic on the market (which is conservative), the profits on those sales would equal $156 million. Pursuant to the 2014 agreement, Par was required to pay 50% of those gross profits, or $78 million, to Takeda, and was able to retain the remaining $95 million.

139.    The payment to Par is the difference between its revenues under the 2014 agreement ($95 million), and what it would have received absent the anticompetitive terms ($57.6 million), or $37.4 million. This difference of $37.4 million is *just during the first 180 days*. Takeda's reverse payments to Par were even larger because they in fact continued for two full years.[2]

140.    The 2014 agreement was structured to make it economically irrational for the brand to launch another generic to compete with Par. Doing so would decrease the prices that

---

[2]  The value of two years of exclusivity to Par is more than $150 million using the same methodology described above for the 180-day exclusivity period. Assuming roughly constant Amitiza sales and 90% generic penetration at 90% of the brand price, Par's estimated revenues over a two-year period would be $692 million calculated as follows: ($427 million) * (2 years) * (0.9 generic penetration) * (0.9 percentage of the brand price). Again assuming a 90% gross profit margin, after paying a 50% royalty, Par would retain about $381 million. Absent any anticompetitive agreements, Par and Takeda would each have earned $57.6 million in the first 180 days of generic entry, as explained above. After the first 180 days, there would have been at least a Takeda AG and a Par ANDA generic, and possibly other ANDA generics, all sharing the 90% generic share of the market at a lower price. If the Takeda AG and the Par ANDA generic were the only generics on the market, they would each earn $173 million over the next 18 months calculated as follows: ($427 million) * (1.5 years) * (0.9 generic penetration) * (0.6 of the brand price) * (0.5 each generic's share of the market). Par and Takeda's total generic revenues for that two-year period would total $231 million each ($57.6 million + $173 million). With additional generic entrants after the 180-day period, the generic price would have been even lower and the generic market would be split more ways, and Takeda and Par's revenues would have been much lower. The value of two years of generic exclusivity to Par is the difference between Par's estimated revenue during the two years after paying a 50% royalty ($381 million) and what it would have received absent any anticompetitive agreements (at most $231 million), which is at least $150 million.

Par could charge (thus reducing total generic profits on which the royalty was to be paid), thereby decreasing the amount of the royalty to be paid by Par to the brand.

141.     Pursuant to the 2014 agreement, if Takeda launched an AG to compete with Par, instead of making $95 million each during the first 180 days, Par would only earn revenues of $57.6 million, as calculated in paragraph 136:  ($427 million) * (0.5 year) * (0.6 of the brand price) * (0.9 generic penetration) * (0.5 of the generic market).  Assuming a 70% profit margin with two generics on the market (which is conservative), the gross profits on those sales would equal $40 million.  Under the 2014 agreement, Par would owe a 15% royalty to Takeda, or $6 million, and retain the other $51.6 million.

142.     Takeda would also earn less under the 2014 Agreement by introducing an AG.  Its revenues from an AG during for the first 180 days would also be $57.6 million, plus it would get the $6 million royalty from Par, or $63.6 million in total, less than the estimated $78 million in royalties that Par would receive from Par in the absence of an AG.

143.     Therefore, under the 2014 agreement, it would make no economic sense for Takeda to launch an AG, because it stood to earn more by not launching an AG than by launching an AG.  In fact, Takeda did not launch an AG (other than the one that Par marketed), unlike its prior course of conduct with numerous other drugs.

144.     Takeda, Sucampo, and Par all knew that while Par had the choice to either market the AG or launch its own ANDA product, Takeda would not launch its own AG in either case.  Thus, the 2014 agreement was a *de facto* no-authorized-generic or no-AG agreement, since it provided for a single generic to have the entire generic market in return for delayed generic entry and a share of the monopoly profits.

145.     The value of this *de facto* no-AG agreement to Par during the first 180 days of its generic entry is at least $37.4 million, the difference between Par's likely revenue under the 2014 agreement and Par's likely revenue absent the agreement.

146.     This effective payment to Par of at least $37.4 million induced Par to accept a delay of its generic entry until January 2021 and drop its challenge to the vulnerable Amitiza patents.

147.     This effective payment of $37.4 million far exceeds any reasonable estimate of litigation expenses that Takeda and Sucampo would have saved by settling the litigation with Par.

### G.     Concealment of the Violation

148.     On October 9, 2014, Sucampo, in conjunction with Takeda and Par, issued a press release announcing the settlement of Takeda's and Sucampo's infringement litigation against Par.  According to the press release, "under the terms of the settlement," Par was granted:

> *a non-exclusive license* to market Par's generic version of lubiprostone 8 mcg soft gelatin capsule and 24 mcg soft gelatin capsule (licensed products) in the U.S. for the indications  approved for AMITIZA beginning January 1, 2021, or earlier under certain circumstances. Beginning on January 1, 2021, Par *will split* with Sucampo the gross profits of the licensed products sold during the term of the agreement, which continues until each of the Sucampo patents has expired. In the event Par elects to launch an authorized generic, Sucampo will supply Par under the terms of a manufacturing and supply agreement at a negotiated price. Additional details of the agreement remain confidential.

149.     The press release misrepresented and obfuscated the true terms of the  2014 agreement. The agreement did not, in fact, provide Par with a "non-exclusive" license. Takeda had agreed not to enter the market with its own, competing authorized generic product indefinitely while the two companies split the supracompetitive profits from the "one generic

only" period. The press release was also misleading because its suggestion that Par and Sucampo would "split" gross profits from the licensed products misrepresented the royalty structure. A "split" implies, but does not necessarily mean, a 50/50 division. In fact, the royalty structure in the agreement provided for a diminishing royalty to be paid to Takeda in the event that other generic products entered the market (including a Takeda authorized generic product).

150.     On November 7, 2014, Sucampo filed a redacted version of the September 30, 2014 written settlement agreement in its Q3 2014 10-Q filing with the SEC. Here too Takeda and Sucampo misrepresented and concealed the true terms of the Takeda/Sucampo-Par 2014 agreement:

151.     Takeda/Sucampo redacted the royalty rates that Par was required to pay Takeda both when it initially launched and when additional generic products came to market. That is, it concealed the economic disincentive for Takeda to actually launch an authorized generic.

152.     Despite failing to disclose this key feature of the agreement, Sucampo disclosed, and did not redact, a provision stating that "[n]nothing in this Agreement shall restrict the ability of Sucampo [and Takeda], from launching, Commercially Marketing and/or selling an Authorized Generic or from licensing a Third Party to launch, Commercially Market and/or sell an Authorized Generic, or from launching, Commercially Marketing, and selling any product for indications or dosages not set forth in Par's ANDA."

153.     Takeda's disclosure of its technical right to launch a competing authorized generic was deceptive. Takeda's actual agreement was that it would not, in fact, launch a competing authorized generic. As the unredacted agreement shows, the agreement actually contained strong economic disincentives for Takeda to launch a competing authorized generic.

And, in fact, Takeda did not launch an authorized generic in January 2021 and has not to this day.

154.     Adding to their deception, on November 21, 2014, Takeda, Sucampo, and Par filed on the docket in the Par patent infringement litigation a proposed consent judgment, for which they sought approval of the district court. The proposed consent judgment, entered on December 2, 2014, stated that the settlement "*will afford Plaintiffs and Par the procompetitive opportunity* to more productively use money and other resources that would have been spent in the continued prosecution and defense of this Patent Litigation, *to the benefit of the parties and consumers alike . . . .*" (emphasis added). These statements were false and further concealed the true nature of the Takeda/Sucampo-Par 2014 agreement from the district court and from the public. Takeda paid Par to delay its competing product by agreeing not to compete with Par once Par launched generic Amitiza. The effect of the agreement was to maintain high prices for brand and generic Amitiza, the opposite of a procompetitive agreement.

## K.     Denial of the Citizen Petition

155.     On July 17, 2015, days after Par's 30-month stay would have ended, the FDA denied Sucampo's citizen petition. In doing so, the FDA stated that the petition's request that generics provide clinical data demonstrating an equivalent safety profile was based on the "incorrect" premise that different lubiprostone products may have different safety profiles. The FDA stated there was no "reason[] to question" the "decades of scientific data on the variability of product characteristics" "or the statistical standards used to ensure meaningful bioequivalence results." The FDA explained that if generic Amitiza products are qualitatively (Q1) and quantitatively (Q2) the same as the reference listed drug, the notion that the generic

product could have a "different safety profile from Amitiza is speculative and *not supported by any scientific basis*."

156.    At the same time, the FDA revised the draft guidance to make it easier for generics to show bioequivalence. It did not add any of the tests proposed by the petition. Instead, it *removed* the need for Q1 and Q2 generics to conduct the clinical studies recommended by the earlier guidance.

**L.     Par's Entry**

157.    On January 4, 2021, Endo International plc, Par's corporate parent, announced that Par had begun shipping the first authorized generic versions of Amitiza (lubiprostone) in 8mcg and 24 mcg capsules, confirming Par's election to proceed as the AG rather than under its own ANDA. No additional generic versions of Amitiza entered the market for an additional two years, *i.e.*, until January 1, 2023 or shortly thereafter.

158.    Takeda and Sucampo have not launched their own AG and instead are sharing the monopoly profits generated by the Par-marketed AG being the only generic on the market.

159.    In the absence of the 2014 agreement, two generics would have been available, and at a much lower price point, well before January 4, 2021.

160.    The FDA would have approved Par's ANDA before January 1, 2021, but after July 17, 2015, when the FDA denied the citizen petition and lowered the bar (but not the scientific standard) for conducting bioequivalence studies for lubiprostone.

161.    A competitively acting generic company in Par's position would have launched sometime between July 17, 2015 and January 1, 2021. Par would have entered (a) at risk, *i.e.*, while patent litigation was still pending, (b) after a patent victory, or (c) pursuant to a settlement agreement that did not contain an unlawful reverse payment. Par itself had launched

at risk at least four times before, including at least twice before a district court decision on the merits.

162.     A company in Takeda's position that was not a party to an unlawful agreement not to introduce an AG to compete with the first ANDA filer would have launched an authorized generic to compete with Par.  In similar circumstances, a brand almost always launches an authorized generic when the first generic comes to market.

163.     In the absence of the anticompetitive agreement, additional generics would have been available, at an even lower price point, thereafter.

164.     As to the seven patents asserted against Par, Par answered and counterclaimed, asserting that each of the patents asserted was invalid, unenforceable, and/or not infringed and, accordingly, that none were impediments to the sale of Par's generic Amitiza ANDA products.

165.     Had the patent litigation proceeded to a decision on the merits, the four later-issued drug product composition patents (the '934, '174, '067, and '649 patents) would not have survived, given (*inter alia*) that their claims are not patentably distinct from the claims of the '858 patent (or indeed from each other).  That they were never asserted against Par (or any of the generics against whom the Amitiza patents were litigated) underscores Takeda's and Sucampo's view that none of these patents posed any true impediment to any generic Amitiza ANDA filer.

166.     Neither the '148 nor the '890 patents were asserted against any generic Amitiza ANDA filer. The brand also did not assert the '481, '283, or '187 patents against Par, underscoring that the patents posed no impediment to generic Amitiza market entry.

167.     With respect to the seven of sixteen Orange Book-listed patents asserted against Par, none claimed the drug substance lubiprostone by itself.  Four claimed methods of treating

various diseases by administering certain drug products and three claimed simple formulations of prostaglandins.

168.    Method-of-use patents, like all patents, must claim novel and non-obvious improvements over the prior art to be upheld in court. All four method-of-use patents asserted against Par (and at least one other generic Amitiza ANDA filer) claimed methods of using the prostaglandin compounds to treat constipation and/or irritable bowel syndrome. The use of prostaglandin compounds to treat constipation and irritable bowel syndrome was well known in the art at least as early as 1987, many years prior to the earliest filed of the method of treatment patents asserted against Par. Accordingly, all of the method-of-use patents would have been found invalid, unenforceable, and/or not infringed by the manufacture, use or sale of the generics' ANDA products, and therefore would not have impeded Par's market entry for generic Amitiza absent the 30-month stay.

169.    The three formulation patents would likewise have been held invalid, unenforceable, and/or not infringed by the manufacture, use or sale of generic Amitiza. Each of them claims formulations of prostaglandin compounds, using known excipients to formulate a pharmaceutical dosage form. For example, at least two of the patents concern gel cap formulations, but the gel cap has been known in the art for nearly 200 years. Because the formulation claims were obvious, none would have prevented Par's market entry for generic Amitiza absent the 30-month stay.

170.    In short, the patents that Takeda and Sucampo actually asserted against Par were vulnerable, easily designed around formulation and method-of-use patents. None of the asserted patents posed a real barrier to the introduction of generic Amitiza beyond the 30-month stay resulting from institution of the litigation.

M.     **Subsequent Generics**

171.    Par was the first generic manufacturer to file an ANDA seeking approval to market generic lubiprostone and was entitled to first-to-file exclusivity, which was triggered when it began marketing the authorized generic on January 4, 2021.  Other generic manufacturers subsequently filed additional ANDAs using Amitiza as the reference listed drug, including Amneal Pharmaceuticals, LLC ("Amneal"), Teva Pharmaceuticals USA, Inc. ("Teva"), Dr. Reddy's Laboratories, Inc. ("DRL") and Zydus Pharmaceuticals, Inc. ("Zydus").  Amneal, Teva, DRL and Zydus each submitted a paragraph IV certification with its ANDA and was subsequently sued by Sucampo and/or Takeda.  As explained below, Takeda settled each of these lawsuits on terms that permitted each of the subsequent generic filers to launch generic lubiprostone on January 1, 2023, two years after the entry date in Par's 2014 settlement agreement.

172.    Amneal and Takeda resolved their patent litigation by entering into a settlement agreement under which Amneal was granted a license to market generic lubiprostone under its ANDA on or after January 1, 2023 (or earlier under certain circumstances).  Amneal received tentative approval on May 19, 2021 and final approval on November 30, 2021.

173.    Teva and Takeda resolved their patent litigation by entering into a settlement agreement under which Teva was granted a license to market generic lubiprostone under its ANDA on or after January 1, 2023 (or earlier under certain circumstances).  Teva received tentative approval on March 9, 2021 and final approval on January 18, 2022.

174.    Zydus and Takeda resolved their patent litigation by entering into a settlement agreement under which Zydus was granted a license to market generic lubiprostone under its

ANDA on or after January 1, 2023 (or earlier under certain circumstances). Zydus received final approval on March 23, 2023.

175.    DRL and Takeda resolved their patent litigation by entering into a settlement and license agreement similar to the 2014 Takeda/Sucampo-Par agreement. Under the agreement with DRL, Sucampo and Takeda granted DRL a license to market its ANDA product in the United States or to market an authorized generic version of Amitiza in the United States beginning on January 1, 2023 (or earlier under certain circumstances). DRL agreed to pay Takeda a share of the gross profits from the sale of the generic that began at 30% and decreased over time. In the event that DRL elected to market an authorized generic rather than its ANDA product, Takeda agreed to supply the authorized generic at a negotiated price. DRL received final approval on February 8, 2022.

176.    In addition to Par, Teva, Amneal and DRL are currently selling generic versions of Amitiza. The entry of additional generics has resulted in a substantial reduction in the price of the drug.

## VI.    ANTICOMPETITIVE EFFECTS

178.    The unlawful 2014 reverse-payment agreement enabled Defendants to: (a) delay until January 1, 2021 the entry of less-expensive generic versions of Amitiza in the United States; (b) fix, raise, maintain, or stabilize the price of Amitiza and its generic equivalents; (c) allocate to Takeda the U.S. market for Amitiza and its generic equivalents until January 1, 2021; and (d) allocate to Takeda and Par collectively the U.S. market for Amitiza and its generic equivalents beginning on January 1, 2021 and for two years thereafter.

179.    But for the unlawful reverse-payment agreements, Par would have begun selling a less expensive generic version of Amitiza much earlier than January 1, 2021. Par would have entered at risk (that is, while the patent litigation remained pending), after prevailing in the patent

litigation or via a licensed entry under a settlement with Takeda that did not include an unlawful reverse payment.

180.     An increasingly competitive market for Amitiza and its generic equivalents, with lower prices, would have thereafter emerged as additional generic versions of Amitiza entered the market. Plaintiffs and their assignors would have purchased generic Amitiza as soon as it became available.

181.     Defendants' unlawful concerted action has (a) delayed and suppressed the sale of generic versions of Amitiza in the United States, (b) enabled Defendants to sell Amitiza at artificially inflated, supracompetitive prices, and (c) caused Plaintiffs and their assignors to pay supracompetitive prices for lubiprostone tablets.

182.     Thus, Defendants' unlawful conduct deprived Plaintiffs of the benefits of competition that the antitrust laws were designed to ensure.

## VII.   ANTITRUST IMPACT

183.     During the relevant period, Plaintiffs' assignors purchased substantial amounts of Amitiza directly from Takeda at supracompetitive prices. Plaintiffs and/or their assignors also purchased authorized generic Amitiza from Par and ANDA generic products from other manufacturers at supracompetitive prices. As a result of Defendants' illegal conduct, Plaintiffs and their assignors were compelled to pay and did pay artificially inflated prices for lubiprostone. Those prices were substantially greater than the prices that Plaintiffs and their assignors would have paid absent the illegal conduct alleged herein, because: (1) Plaintiffs and their assignors were deprived of the opportunity to purchase lower-priced generic versions of Amitiza instead of higher-priced brand Amitiza; and (2) Plaintiffs and their assignors paid higher prices for generic Amitiza when it became available than they would have paid if generic Amitiza had become

available earlier, and if two versions of generic Amitiza had become available rather than only one.

184.    As a consequence, Plaintiffs have sustained and will continue to sustain substantial losses and damage to their business and property in the form of overcharges. The full amount of such damages will be calculated after discovery and upon proof at trial.

185.    Defendants' conspiracy continues to the present day, and Plaintiffs' injuries are ongoing.  Plaintiffs (and their assignors) will continue to pay supracompetitive prices for lubiprostone for months or years into the future.  Thus, Defendants' conduct threatens continuing loss and damage to Plaintiffs unless enjoined by this Court.

## VIII.   INTERSTATE COMMERCE

186.    The drugs at issue in this case are manufactured and sold in interstate commerce, and Defendants' unlawful conduct alleged herein has occurred in, and has had a substantial effect on, interstate commerce.

## IX.    MONOPOLY POWER AND MARKET DEFINITION

187.    At all relevant times, Takeda had monopoly power over lubiprostone products because it had the power to maintain the price of the drug at supracompetitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as Amitiza.

188.    "[T]he 'size of the payment from a branded drug manufacturer to a prospective generic is itself a strong indicator of power'—namely, the power to charge prices higher than the competitive level." *FTC v. Actavis, Inc.*, 570 U.S. 136, 157 (2013).  A firm that lacks monopoly power is not "likely to pay 'large sums' to induce 'others to stay out of its market.'" *Id.*

189.    A small but significant, non-transitory price increase for Amitiza would not have caused a significant loss of sales to non-lubiprostone products.

190.    Amitiza does not exhibit significant, positive cross-elasticity of demand with respect to price with any non-lubiprostone product. Indeed, Takeda has never lowered the price of Amitiza in response to the pricing of any non-lubiprostone treatment.

191.    Because of its labeling, Amitiza is differentiated from all non-lubiprostone products.

192.    Takeda needed to control only lubiprostone, and no other products, in order to maintain the price of Amitiza profitably at supracompetitive prices.

193.    Takeda sold Amitiza at prices well in excess of marginal costs, and in excess of the competitive price, and enjoyed high profit margins.

194.    Takeda had and exercised the power to exclude and restrict competition to Amitiza.

195.    At all relevant times, high barriers to entry existed with respect to the entry of competitive products that could constrain the price of Amitiza due to patent and other regulatory protections and the high costs of entry and expansion.

196.    The relevant product market is Amitiza and its AB-rated generic lubiprostone. During the period relevant to this case, Takeda has been able to profitably maintain the price of lubiprostone well above competitive levels.

197.    The relevant geographic market is the United States and its territories.

198.    At all relevant times, Takeda's market share in the relevant market has been and remains 100%, implying a substantial amount of monopoly power.

## X.    CLAIM ACCRUAL AND TOLLING

199.    By virtue of their assignments, Plaintiffs are absent class members in a putative direct purchaser class action pending in this Court. *See FWK Holdings, LLC et al. v. Takeda Pharm. Co. Ltd. et al.*, Civil Action No. 1:21-cv-11057-MJJ (filed June 25, 2021). The *FWK*

*Holdings* complaint was filed on June 25, 2021 and tolled the applicable statute of limitations as to all putative class members. Thus, even without any additional tolling, Plaintiffs' Complaint is timely as to all claims for overcharges based on purchases of brand or generic Amitiza that occurred during the four years prior to the filing of the *FWK Holdings* complaint (*i.e.*, on or after June 26, 2017).

200. Plaintiffs' claims for overcharges based on purchases prior to June 26, 2017 are also timely because Defendants and their co-conspirators fraudulently concealed their unlawful conduct, and Plaintiffs did not and could not have discovered that conduct by the exercise of reasonable diligence prior to January 2021, when Par launched the Amitiza AG. The doctrine of fraudulent concealment applies because (a) Defendants affirmatively concealed their violation of the antitrust laws, (b) Plaintiffs remained in ignorance of their claim until January 2021, and (c) Plaintiffs' ignorance was not attributable to lack of diligence on their part.

201. As a result of class action tolling and Defendants' fraudulent concealment, the four-year statute of limitations applicable to Plaintiffs' claims for overcharges was tolled at all relevant times, and Plaintiffs are entitled to recover overcharges on all relevant purchases of branded and generic Amitiza without regard to the timing of those purchases.

## XI.   CLAIMS FOR RELIEF

### CLAIM ONE
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
### CONSPIRACY IN RESTRAINT OF TRADE

202. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 201 above.

203. Takeda, Sucampo and their co-conspirator Par have engaged in an unlawful contract, combination, or conspiracy that has unreasonably restrained trade or commerce in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

204.    Starting in or about September 2014, and continuing to the present day, Takeda, Sucampo and Par entered into and maintained an illegal contract, combination or conspiracy in restraint of trade under which Takeda and Sucampo made a large reverse payment to Par in exchange for Par's agreement to delay the launch of generic Amitiza until January 1, 2021.  The purpose and effect of this reverse-payment agreement was to: (a) allocate to Takeda and Sucampo 100% of the U.S. sales of lubiprostone until January 1, 2021; (b) delay the availability of generic Amitiza in the United States, thereby protecting Amitiza from any generic competition until January 1, 2021; (c) allocate to Takeda, Sucampo and Par collectively 100% of the U.S. sales of generic lubiprostone beginning on January 1, 2021 and continuing for up to two years; and (d) fix and maintain, at supracompetitive levels, the price Plaintiffs paid for lubiprostone.

205.    The reverse payment to Par was large and unjustified.

206.    There is and was no legitimate, non-pretextual, procompetitive justification for the reverse payment to Par that outweighs its harmful effect. Even if there were some conceivable justification, the payments were not necessary to achieve, or were not the least restrictive means of achieving, such a purpose.

207.    As a direct, proximate, foreseeable, and intended result of the reverse-payment agreement among Takeda, Sucampo and Par, Plaintiffs were harmed and suffered overcharge damages in an amount to be determined at trial.  Defendants' conduct threatens continuing injury to Plaintiffs unless enjoined by this Court.

## CLAIM TWO
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
## MONOPOLIZATION BY TAKEDA

208.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 201 above.

209.    At all relevant times prior to January 1, 2021, Takeda possessed substantial market power (i.e., monopoly power) in the relevant market. Takeda possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

210.    By entering into a reverse-payment agreement with Par, and possibly with other generic manufacturers, Takeda willfully and intentionally maintained, enhanced, and extended its monopoly power using restrictive or exclusionary conduct.  Specifically, Takeda (a) allocated to itself 100% of the market for lubiprostone in the United States until January 1, 2021; (b) delayed the availability of generic versions of Amitiza in the United States, thereby protecting Amitiza from any generic competition until January 1, 2021; (c) allocated to itself and Par collectively 100% of the market for generic lubiprostone in the United States beginning on January 1, 2021 and continuing for up to two years thereafter; and (d) fixed and maintained, at supracompetitive levels, the price Plaintiffs paid for lubiprostone.

211.    It was Takeda's conscious objective to further its control of and dominance in the relevant market by and through the anticompetitive conduct alleged herein.

212.    Takeda's anticompetitive conduct substantially harmed competition and maintained monopoly power in the relevant market, as alleged herein.

213.    As a direct, proximate, foreseeable, and intended result of Takeda's illegal and monopolistic conduct, Plaintiffs were harmed and suffered overcharge damages in an amount to be determined at trial.  Defendants' conduct threatens continuing injury to Plaintiffs unless enjoined by this Court.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants, jointly and severally where appropriate, and for the following relief:

A.      A declaration that the conduct alleged above is in violation of sections 1 and 2 of the Sherman Act;

B.      An award of Plaintiff's overcharge damages, in an amount to be determined at trial, trebled as provided by law;

C.      Permanent injunctive relief enjoining and restraining Defendants from continuing their unlawful conduct and requiring them to take affirmative steps to dissipate the continuing effects of their prior unlawful conduct;

D.      An award of Plaintiff's costs and reasonable attorneys' fees; and

E.      Such other and further relief as the Court may deem just and proper.

## XII.  JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED: December 13, 2023                 Respectfully submitted,

/s/ *Douglas H. Patton*
Douglas H. Patton
Scott E. Perwin (*pro hac vice* motion forthcoming)
Lauren C. Ravkind (*pro hac vice* motion forthcoming)
Anna T. Neill (*pro hac vice* motion forthcoming)
KENNY NACHWALTER P.A.
Four Seasons Tower
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
Email: sperwin@knpa.com
Email: lravkind@knpa.com
Email: aneill@knpa.com
*Attorneys for Plaintiffs*